MQ CONSTRUCTION COMPANY, INC., Plaintiff-Appellee, v. INTERCARGO INSURANCE COMPANY, Defendant-Appellant.

First District (3rd Division)    No. 1—99—3424

Opinion filed December 29, 2000.

674

Riordan, Dashiell & Donnelly, Ltd., of Chicago (Paul A. Brocksmith, of counsel), for appellant.

Paul Goodman, of Bruce B. Jackson & Associates, Ltd., of Chicago, for appellee.

JUSTICE BURKE delivered the opinion of the court:

Defendant Intercargo Insurance Company, a surety on a public

construction bond, appeals from an order of the circuit court entering judgment in favor of plaintiff MQ Construction Co., Inc., on plaintiff's claim against defendant's bond for money owed to plaintiff for certain construction work it performed on a public construction project. On appeal, defendant contends that the trial court erred in finding that December 12, 1996, was the "last day of work" of plaintiff on the project for purposes of determining whether plaintiff filed a timely notice of its claim against defendant's bond as required by the Illinois Public Construction Bond Act (Bond Act) (30 ILCS 550/2 (West 1996)). For the reasons set forth below, we reverse.

The City of Chicago (City) hired Roadworks, Inc. (Roadworks), as the general contractor for a public works construction contract known as "project No. S—5—020, 1995 Model Block Group 21—A" (project). Plaintiff entered into an "agreement" with Roadworks for certain work on the project, which included: "Type 4 curb removal; Type 4 curb replacement; 5″ PCC mainwalk; 5″ PCC for the disabled; 8″ PCC driveway; Type 3 curb removal; Type 3 curb replacement." Although a complete contract is not contained in the record, portions of the "General Conditions and Special Conditions" for the City's project contract provided:

"The Contractors shall not be entitled to demand or receive final payment until all the stipulations, provisions and conditions as set forth in the contract have been complied with, and the work has been accepted by the Commissioner, whereupon the City will, at the expiration of 30 calendar days after such completion and acceptance, pay the whole account of money due the contractor under the contract.

The acceptance by the Contractor of the final payment above mentioned shall operate as and shall be a release to the City from all claims or liability under this contract, or for any act or neglect of the city relating to or connected with this contract.

\* \* \*

Contractor's Responsibility for Work

The Work shall be under the charge and care of the Contractor until final acceptance by the Commissioner, including all 'Punch List' work, unless otherwise specified in the Contract Documents.

\* \* \*

The Work will not be considered as completed and accepted until a written notice from the Commissioner, confirming the Final Completion and acceptance of all Work, including 'Punch List' Work has been received by the Contractor."

On April 3, 1995, Roadworks, with defendant acting as surety, obtained a "Contractors's Performance Bond" in which it agreed to be bound to the City for $783,989.55 for the work, labor, and materials

used on the project. Between April 24, 1995, and May 12, 1995, plaintiff performed its work on the project pursuant to its agreement with Roadworks. On June 6, 1995, plaintiff sent an "invoice" to Roadworks for "full and final payment" pursuant to the agreement. The invoice itemized the work performed, listed the "total" for the work as $146,796.20, indicated that a previous payment had been made for $70,000, and demanded payment of $81,796.20.

In December 1996, plaintiff received a copy of a "memorandum" and an accompanying "Preliminary Punch List" sent to Roadworks from the project director for the City. The document stated, in part: "Final payment shall be withheld until both preliminary and final punch list items are completed to the city's satisfaction." Items 1, 3 through 8, and 10 on the punch list required patching or replacing certain sections of sidewalk that plaintiff had originally constructed in April or May 1995, but which had been "marred after pouring and after the wet cement had cured, or which had cracked subsequent to installation." On December 12, plaintiff returned to the project site and performed the punch list items related to its work and did not perform any further work on the project after that date. Plaintiff did not issue an invoice to Roadworks for the work plaintiff performed on December 12.

On January 17, 1997, plaintiff filed an "Original Contractor's Mechanic's Claim for Lien" against the City and Roadworks to recover the balance of $81,796.20 for the work plaintiff performed in "April, May, and June" 1995. On January 28, defendant received a copy of plaintiff's claim on defendant's bond for the project and requested that plaintiff complete a "Proof of Claim" form and supply other documentation supporting plaintiff's claim. Plaintiff completed the "Proof of Claim," indicating on the form that it last furnished labor, materials, supplies, and services in connection with the claim on December 12, 1996.

On April 8, 1997, defendant denied liability for plaintiff's claim, stating that its investigation revealed that plaintiff "completed its original contract work" in June 1995 and that plaintiff's work in December 1996 was "corrective and cosmetic" and did not extend the time that plaintiff was required to make a claim against the "contractor's bond." Because plaintiff had not filed a claim against the bond within 180 days of the completion of its work in June 1995, as required by section 2 of the Bond Act, defendant denied the claim.

On June 12, 1997, plaintiff filed a verified complaint for declaratory judgment, alleging that it provided labor and materials on December 12, 1996, to cure punch list deficiencies "pursuant to its obligations to Roadworks," and that it properly filed a lien 36 days af-

ter the "last item of work" pursuant to the Bond Act. The complaint requested that the trial court declare that plaintiff was entitled to coverage under the "Contractor's Performance Bond" and that defendant was obligated to provide coverage for plaintiff's loss pursuant to the terms of the bond.

Defendant filed a section 2—615 motion to dismiss the complaint (735 ILCS 5/2—615 (West 1996)), arguing that plaintiff's case was inappropriate for declaratory relief because (1) plaintiff did not seek a determination of the construction of an ambiguous statute or contract provision, (2) plaintiff only sought the enforcement of a right "after the fact" and not a declaration of present rights, and (3) section 2 of the Bond Act (30 ILCS 550/2 (West 1996)) "provided a specifically enacted and far more appropriate remedy than a declaratory judgment action." The parties entered an agreed order which, among other things, struck the prayer for relief of plaintiff's verified complaint for declaratory judgment and granted plaintiff leave to file an amended complaint.

Plaintiff filed an amended complaint which contained allegations similar to those in the original complaint but requested judgment in plaintiff's favor in the amount of $81,796.20, plus interest. Defendant filed its answer to the amended complaint, denying all material allegations against it, and, as an affirmative defense, stated that the "corrective" work performed by plaintiff on December 12, 1996, did not extend the time in which plaintiff was required to notify defendant of its claim and that plaintiff's claim was not filed within 180 days.

Thereafter, defendant filed a motion for summary judgment. Although defendant stated that there were no Illinois decisions interpreting the term "last work" in reference to the 180-day "claim notice" requirement in the Bond Act, defendant argued that "last work" should be interpreted in a fashion similar to interpretations of similar terms in the federal Miller Act (40 U.S.C. § 270a (1994)) and the Illinois Mechanics Lien Act (770 ILCS 60/0.01 *et seq.* (West 1996)). Defendant argued that under those acts the applicable limitations period to demand payment under the acts begins on the day that the original work is completed on the project and subsequent "corrective" work is not considered with respect to the limitations period. Defendant contended that the trial court, therefore, should adopt a similar interpretation for the Bond Act by finding that plaintiff's "last work" on the project occurred in June 1995, starting the 180-day limitations period under the Act, and that the "corrective" work performed by plaintiff in December 1996 had no effect on this period.

In response to defendant's summary judgment motion, plaintiff argued that because it had received correspondence from the City

indicating that final payment would not be made until all punch list items were completed, the City did not consider "the contract substantially performed." Plaintiff maintained that this created a genuine issue of material fact as to whether it had substantially performed its contract in a workmanlike manner in May 1995, entitling plaintiff to demand payment at that time, or in December 1996, after it had completed the punch list items. Plaintiff also argued that defendant's position was not supported by Illinois law.

The trial court denied defendant's motion for summary judgment. On March 25, 1999, Michael Quaranta, plaintiff's owner, gave his deposition. He testified that he entered into a verbal agreement with the owner of Roadworks for the work on the project. Roadworks had agreed to pay plaintiff for the work plaintiff performed at the same rate that Roadworks was to be paid by the City for the same work. Plaintiff was not paid directly by the City, and Roadworks did make an informal partial payment of $70,000 to plaintiff. Quaranta was aware that Roadworks was no longer in business, and Quaranta did not send an invoice to Roadworks for the work performed on December 12, 1996, because contractors are typically not paid for punch list work. Quaranta admitted that the punch list work was "corrective" in nature, but he did not consider the work on the contract as complete, entitling him to payment, until all the punch list and corrective work had been completed.

The parties entered into a "Joint Final Pre-Trial Memorandum" containing a statement of stipulated facts which listed facts similar to those above. Both parties separately filed a memorandum in support of their position at trial. Plaintiff again argued that December 12, 1996, was its "last day of work" because it was required to complete punch list items to the City's satisfaction before receiving payment. In support of its argument, plaintiff cited to the portions of the "General Conditions and Special Conditions" to the contract for the project, as stated above. Defendant argued in its memorandum that the Bond Act at issue, the federal Miller Act, and the Illinois Mechanics Lien Act all had similar purposes and contained "last work"-based limitations. Defendant argued, therefore, that the Bond Act should be interpreted similarly to the Miller Act and the Mechanics Lien Act, which interpreted "last work" to refer to the last original performance of the work as opposed to subsequent repairs.

A bench trial on plaintiff's complaint was held on July 21, 1999. The parties did not present any witnesses. On August 19, 1999, the trial court issued a written order in favor of plaintiff, finding that "the date that the Plaintiff completed its work pursuant to the Contract between it and Roadworks [was] the controlling date for purposes of

running the 180[-day] claim filing period." After quoting portions of "The City Contract," stating that final payment would not be received until the provisions of the contract had been complied with and final acceptance of the work, including punch list items, by the Commissioner, as stated above, the trial court stated:

> "The Court finds that the work performed by MQ on December 12, 1996, was pursuant to the provisions of the underlying contract which required full completion of all Punch List Work and corrective work before the terms of the contract were considered complied with. Hence it was reasonable for MQ to believe it has 180 days from December 12, 1996 to file a Claim if the amount sought was not paid. There is no evidence that the work on December 12, 1996, was other than pursuant to the original contract for work, [n]or is there any evidence to support a finding that the work was done to extend the time for filing the claim."

On September 2, the trial court awarded plaintiff $76,796.20, and this appeal followed.

■ Defendant argues that the standard of review is *de novo* because the issue is one of statutory interpretation requiring a legal conclusion based on stipulated facts and documentary submissions. Plaintiff does not state a standard of review in its brief. It is well settled that "[w]hen the only question before a court is the legal conclusion to be drawn from a given set of facts and the credibility of witnesses is not in issue, review of a trial court's holding is *de novo*." *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 742-43, 666 N.E.2d 704 (1996). In the present case, because no witnesses testified at trial, the facts before the court were stipulated to by the parties, and the trial court made a legal conclusion based on these facts, the standard of review here is *de novo*.

Defendant first contends that the Bond Act shares a "common purpose" with the federal Miller Act and the Illinois Mechanics Lien Act by protecting suppliers of labor and material. Defendant also contends that the limitations period in the Bond Act, requiring notice of a claim within 180 days from the date that the supplier performed its "last work" on the project, offers protection to project owners, sureties, and prime contractors similar to the limitations periods found in the Miller Act and the Mechanics Lien Act. Defendant argues that courts, when interpreting the "last work"-based notifications and limitations provisions in the Miller Act and Mechanics Lien Act, have disregarded the date of performance of "corrective work" and instead looked to the "date of completion of the original performance of the contract for purposes of fixing the date of 'last work' " to determine when the limitations period begins to run. Defendant maintains that

because the Bond Act shares a common purpose with the Miller Act and Mechanics Lien Act, it should be interpreted in a similar fashion. According to defendant, plaintiff originally performed its contract work in May 1995, beginning the 180-day limitations period, and the work plaintiff performed in December 1996 was "corrective" in nature and did not affect the limitations period. Defendant argues, therefore, that because plaintiff did not file a claim against defendant's bond within 180 days of its "last work" in May 1995, plaintiff's claim is untimely, and the trial court erred in entering judgment in favor of plaintiff.

Plaintiff contends that defendant's argument ignores the specific contract provisions by which plaintiff was bound during the project. Specifically, plaintiff argues that irrespective of whether the work it performed on the project was "original" versus "corrective," this court must determine, as the trial court determined, whether plaintiff was performing work pursuant to its contract when evaluating which was the last date of work that plaintiff provided labor or materials. Plaintiff claims that the work it performed in December 1996 was "at the request and demand of the City" and "required" by the contract because the relevant terms of the contract stated that the project would not be considered complete, and payment made, unless all punch list items were performed and accepted by the Commissioner. Plaintiff maintains that its notice of its claim on the bond was timely because it was made within 180 days of the work performed in December 1996.

Defendant counters that the contractual provisions relied on by plaintiff were included in the contract between the City, as owner of the project, and Roadworks and that plaintiff, as Roadworks' subcontractor, was not in contractual privity with the owner. Defendant contends, therefore, that plaintiff's reliance on the contractual provision that the work would not be considered complete nor payment made until all punch list items were finished is misplaced. Defendant maintains that plaintiff was not obligated to respond to a request or a demand from the City to complete punch list work. Defendant reasserts that it is the nature of the work, *i.e.*, whether corrective or original, that determines when the limitations period in section 2 of the Bond Act begins to run.

Section 2 of the Bond Act provides, in relevant part:

"Every person furnishing material or performing labor, either as an individual or as a sub-contractor for any contractor, with the State, or a political subdivision thereof where bond or letter of credit shall be executed as provided in this Act, shall have the right to sue on such bond or letter of credit in the name of the State *** for his use and benefit ***. Provided, however, that any person

having a claim for labor, and material as aforesaid shall have no such right of action unless he shall have filed a verified notice of said claim with the officer, board, bureau or department awarding the contract, within 180 days after the date of the *last item of work* or the furnishing of the last item of materials, and shall have furnished a copy of such verified notice to the contractor within 10 days of the filing of the notice with the agency awarding the contract." (Emphasis added.) 30 ILCS 550/2 (West 1996).

The Bond Act provides an "alternate remedy to that afforded by the Mechanics' Lien Act" and the Bond Act's purpose is to protect contractors and materialmen for whom no right of a mechanic's lien exists against a public body and to regulate claims against public monies. *City of Chicago ex rel. Charles Equipment Co. v. United States Fidelity & Guaranty Co.*, 142 Ill. App. 3d 621, 626, 491 N.E.2d 1269 (1986). Similarly, the purpose of the Illinois Mechanics Lien Act is to protect those who in good faith furnish material or labor for the construction of buildings. *Miller v. Reed*, 13 Ill. App. 3d 1074, 1076, 302 N.E.2d 131 (1973).

■ The primary rule of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the intent and meaning of the legislature. *In re Application for Judgment & Sale of Delinquent Properties for the Tax Year 1989*, 167 Ill. 2d 161, 168, 656 N.E.2d 1049 (1995). Courts should look to the language of the statute as the best indication of legislative intent, giving the terms of the statute their ordinary meaning. *In re Application for Judgment*, 167 Ill. 2d at 168. Statutes should be construed in conjunction with other statutes addressing the same subject. *In re Application for Judgment*, 167 Ill. 2d at 168-69. We presume that statutes which relate to one subject are governed by one spirit and a single policy, and that the legislature intended the enactments to be consistent and harmonious. Even when apparent conflicts exist, we are to construe such statutes in harmony with each other, if reasonably possible. *People v. Maya*, 105 Ill. 2d 281, 286-87, 473 N.E.2d 1287 (1985). "Reference to another statute by analogy is also a common method of interpretation and has been relied upon by this court on many occasions." *Waste Management of Illinois, Inc. v. Illinois Pollution Control Board*, 145 Ill. 2d 345, 351, 585 N.E.2d 606 (1991). As a noted authority has explained: "On the basis of analogy the interpretation of a doubtful statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships. By referring to other similar legislation, a court is able to learn the purpose and course of legislation in general, and by transposing the clear intent expressed in one or several statutes to a similar statute of doubtful meaning, the

court not only is able to give effect to the probable intent of the legislature, but also to establish a more uniform and harmonious system of law." 2B N. Singer, Sutherland on Statutory Construction § 53.03, at 233 (5th ed. 1992).

Initially, we note that the term "last work," which is at issue here, is not defined in the Bond Act and that a review of the Bond Act indicates that the term is ambiguous and subject to more than one reasonable interpretation, as indicated by the arguments of the parties. We, therefore, find it appropriate to review other courts' interpretations of language in similar statutes in order to give effect to the intention of the legislature in enacting the Bond Act.

The parties primarily rely on cases addressing similar issues under the Miller Act and the Mechanics Lien Act, and we find those cases instructive on the issue here. In *United States v. Andrews*, 406 F.2d 790 (4th Cir. 1969), the Fourth Circuit Court of Appeals addressed a similar issue under the Miller Act, the federal equivalent to Illinois' Bond Act. In *Andrews*, the plaintiff supplied certain materials to a plumbing and fixtures subcontractor working on a government project. On October 17, 1966, the defendant general contractor informed the government that the plumbing subcontractor's work was complete, the government made an inspection finding the work acceptable except for a few deficiencies which were fixed immediately, and the government accepted the job and took possession of the premises. While subsequently visiting the site for an unrelated matter, an employee of the electrical subcontractor discovered "by chance" that two gate valves required under the contract between the defendant and the government had not been supplied or installed. The valves were ordered from the plaintiff, which delivered them on January 17, 1967. On January 25, the plaintiff sent the defendant a written notice claiming that the defendant was obligated to pay the plaintiff the plumbing subcontractor's unpaid balance for all materials supplied by the plaintiff for the project, including those delivered in 1966. *Andrews*, 406 F.2d at 792.

The *Andrews* court analyzed whether the January 25, 1967, notice from the plaintiff satisfied the 90-day limitations period of the Miller Act where the notice was received within 90 days of the delivery of the valves but not within 90 days of the last delivery of materials on October 19, 1966. The court stated that "[u]nder the Miller Act a subcontractor may not recover on the bond unless he delivers materials or performs labor called for by the terms of the prime contract and also serves notice within ninety days after the date of such delivery or performance." (Emphasis omitted.) *Andrews*, 406 F.2d at 793. The court further stated that the applicable legal test is "whether the

work was performed and the material supplied as a 'part of the original contract' or for the 'purpose of correcting defects, or making repairs following inspection of the project.' " *Andrews*, 406 F.2d at 792, quoting *United States ex rel. Austin v. Western Electric Co.*, 337 F.2d 568, 572-73 (9th Cir. 1964)). The *Andrews* court found that the installation of the two valves could not be characterized as a mere correction of a defect because the valves were called for under both the primary and subcontracts and were not delivered until January 17, 1967. The court further noted that "the contract was not completed until the valves were installed, and that their delivery in January [1967] is the critical date from which to measure the Miller Act limitation period." *Andrews*, 406 F.2d at 793.

In *United States v. Continental Insurance Co.*, 776 F.2d 962, 963-64 (11th Cir. 1985), where the plaintiff subcontractor sought payment from the defendant surety, the Eleventh Circuit Court of Appeals stated: "The Miller Act requires that claims brought under it be made within one year 'after the day on which the last of the labor was performed or material was supplied ***' under the contract. [Citation.] In determining the last day that 'labor' was performed, repairs made on the original project are not taken into consideration." The *Continental Insurance* court reversed the district court's judgment in favor of the subcontractor on the defendant's bond because the plaintiff had not met its burden of proving by a preponderance of the evidence that the work performed on the job site did not involve repairs. *Continental Insurance*, 776 F.2d at 964.

In *Miller Brothers Industrial Sheet Metal Corp. v. La Salle National Bank*, 119 Ill. App. 2d 23, 255 N.E.2d 755 (1969), the Second District Appellate Court analyzed a similar issue under the Mechanics Lien Act. In *Miller Brothers*, a subcontractor performed the installation of a plate glass curtain wall. On November 1, 1966, the subcontractor submitted an application for payment which stated that all of the work had been completed, including "change orders," and was marked "Final" in two places. Similar applications were subsequently made but never paid. The record indicated that the subcontractor sent three glazers to the jobsite on January 11, 1967, to "re-set" some gasket material on certain lights that had worked loose. No additional billing was submitted and the work was considered a part of the agreed contract price. On March 8, 1967, the subcontractor filed a lien with the office of the county recorder. *Miller Brothers*, 119 Ill. App. 2d at 28. The *Miller Brothers* court found that the trial court's determination, that the subcontractor had completed its work by November 1, 1966, within the meaning of the section of the Mechanics Lien Act requiring that a verified claim for lien be filed "within four months af-

ter completion of the work," was not against the manifest weight of the evidence. *Miller Brothers*, 119 Ill. App. 2d at 28. The *Miller Brothers* court disagreed with the subcontractor's argument that the January 11 work was an "integral part of the original contract and that therefore its notice was filed within the time limit of the statute." 119 Ill. App. 2d at 29. The court found that the January 11 work was in the "nature of maintenance of a completed job rather than the completion of the contract itself" and that the work was to "correct some malfunction." 119 Ill. App. 2d at 30.

■ We have found no cases addressing this particular issue under Illinois' Bond Act, and, thus, this is an issue of first impression. Because of the absence of Illinois authority and the similarity of the purposes of the Bond Act, the Miller Act and the Mechanics Lien Act, we believe that the term "last work," as used in the Bond Act, should be interpreted in a manner similar to the nearly identical terms in the Miller Act and the Mechanics Lien Act. Under those Acts, as indicated in *Andrews, Continental Insurance*, and *Miller Brothers*, corrective or repair work is not considered in determining the date that a contractor supplied its "last work" on a project for purposes of calculating the limitations period for claims relating to that work. We find that the legislature's use of a similar term in the Bond Act suggests that the legislature also intended to exclude corrective or repair work when determining the date of "last work" under the Bond Act. Pursuant to the Bond Act, therefore, we must determine the date upon which plaintiff completed its original contract work on the project.

■ The issue here is made more difficult by the fact that the subcontract between plaintiff and Roadworks was oral, and there is little evidence in the record of the terms of that contract. The contractual language relied on by the trial court, in determining that the punch list items needed to be completed and accepted by the City before the contract would be considered complete, was found in the "General Conditions and Special Conditions" in the City's project contract with Roadworks. There is no evidence that similar provisions were included in the subcontract between plaintiff and Roadworks or that the subcontract incorporated the conditions in the primary project contract. Additionally, the brief portions of the primary project contract that are included in the record do not indicate that all subcontractors were to be bound by the "General Conditions and Special Conditions" in that contract.

In *Continental Insurance*, the court stated that the claimant had the burden of proving by a preponderance of the evidence that the work at issue was not repair work in order to be entitled to judgment. The record here, however, contains facts which support defendant's

argument that plaintiff completed its original contract work in May 1995, as opposed to December 1996. Michael Quaranta, plaintiff's owner, testified regarding some of the terms of the oral subcontract between plaintiff and Roadworks, stating that Roadworks was to pay plaintiff at the same rate that Roadworks was to be paid by the City for the sidewalk and curb work on the project. Although Quaranta stated that he personally did not think that plaintiff's contract was complete until all punch list items were performed, he did admit that plaintiff's work performed in December 1996 was "corrective" in nature. Additionally, according to the stipulated facts in the pretrial memorandum entered into by the parties, plaintiff, in June 1995, sent an invoice to Roadworks demanding $81,796.20 as "full and final payment." This language is an indication, as it was in *Miller Brothers*, that plaintiff considered its contract work complete by June 1995. The invoice also reflected that defendant had already made a partial payment of $70,000 to plaintiff. Plaintiff's payment demand and receipt of the partial payment contradict its reliance on the language in the primary contract to support its argument that it believed it had to complete punch list items before it could expect payment. The punch list work was not performed until approximately 18 months after plaintiff initially demanded "full and final payment." Although plaintiff was "carbon copied" on the punch list memorandum, the list was sent by the City to Roadworks.

The record further shows that the work performed in December 1996 was merely corrective in nature. The work involved three of plaintiff's employees returning to the site to correct defects in the sidewalks and curbs that had been initially poured in May 1995. This repair work is similar to the "re-setting" work performed by the claimant in *Miller Brothers*, which the court in that case deemed mere maintenance of completed work. For example, plaintiff's workers, in the present case, filled in footprints on the sidewalks and corrected other defects. Plaintiff's employees completed the work in one day. The employees were not performing work that they had inadvertently missed or forgotten, similar to the missing valves in *Andrews*; they were correcting prior work that had been marred. Additionally, plaintiff did not bill Roadworks for the work performed in December 1996. Quaranta testified that punch list work is typically not billed. The nature of the work in December 1996, therefore, also supports defendant's contention that the work was merely "corrective" in nature and should not be considered in determining the date from which the 180-day limitations period under the Bond Act began to run.

Although defendant has not contested that plaintiff in fact earned

the amount sought in its amended complaint, we find that the purpose and the language of the Bond Act require our decision here. The trial court erred in merely relying on and applying the "General Conditions and Special Conditions" in the primary contract to plaintiff without additional evidence that plaintiff was bound by the terms of that contract. The record supports defendant's argument that the 180-day limitations period under the Bond Act began to run on plaintiff's last day of work in May 1995, and plaintiff's claim notice in January 1997 against defendant's bond was, therefore, untimely.

For the reasons stated, we reverse the judgment of the circuit court.

Reversed.

HALL, P.J., and CERDA, J., concur.